SEVERSON, Justice
(dissenting).
[¶ 44.] I respectfully dissent. The Association has failed to establish that the District committed a grievable action when it honored binding contracts it entered into with individual teachers in accordance with state law and the terms of the District’s then current agreement with the Association.
[¶ 45.] A grievance is “a complaint by a public employee or group of public employees based upon an alleged violation, misinterpretation, or inequitable application of any existing agreements!)]” SDCL 3-18-1.1. The District issued individual contracts to teachers hired while negotiations were in progress as required by South Dakota law and the terms of the District’s then current agreement with the Association. See SDCL 3-18-8.2. These binding individual contracts established a set salary for the entire school year, and the District did not inequitably apply its last offer when it honored those individual contracts rather than applying Article X, the new salary schedule incorporated into the District’s last offer. Indeed, the District did not have the authority to unilaterally alter the compensation in the binding contracts with individual teachers, because the terms of the contracts could be modified only by mutual agreement of the District and the individual teacher. The District’s actions therefore did not constitute a violation of an existing collective bargaining agreement, and the circuit court’s decision dismissing the grievance should be affirmed.
[¶ 46.] “This Court has previously applied general principles of contract law to disputes involving trade agreements.” Council of Higher Educ., 2002 SD 55, ¶ 10, 645 N.W.2d at 244. “In Gettysburg Sch. Dist. [No.] 53-1 v. Larson, 2001 SD 91, ¶ 11, 631 N.W.2d 196, 200, we held that ‘[disputes over the meaning of terms in teacher contracts are resolved under the general principles of contract law.’ ” Id. See Wessington Springs Educ. Ass’n, 467 N.W.2d at 104.
[¶ 47.] “South Dakota law provides public employees with the opportunity to bargain collectively with their employers.” Council of Higher Educ., 2002 SD 55, ¶ 7, 645 N.W.2d at 242 (citing SDCL ch. 3-18). “This process ‘requires public employers to negotiate matters of pay, wages, hours of employment, or other conditions of employment.’ ” Id. (quoting Sisseton Educ. Ass’n v. Sisseton Sch. Dist. No. 54-8, 516 N.W.2d 301, 303 (S.D.1994)) (additional citation omitted). The result of collective bargaining, however, is a trade agreement, rather than a contract of employment. Id. ¶ 9, 645 N.W.2d at 243 (citing J.I. Case, 321 U.S. at 334-35, 64 S.Ct. at 579). “[N]o one has a job by reason of it and no *494 obligation to any individual ordinarily comes into existence from it alone.” Id. The trade agreement is a contract between the union and the organization. Id. ¶ 10, 645 N.W.2d at 243-44. “After the collective trade agreement is made, the individuals who shall benefit by it are identified by individual hiring.” J.I. Case, 321 U.S. at 335, 64 S.Ct. at 579. “In the sense of contracts of hiring, individual contracts between the employer and employee are not forbidden but indeed are necessitated by the collective bargaining procedure.” Id. at 335-36, 64 S.Ct. at 579.
[¶48.] South Dakota law and the District’s then current agreement with the Association recognized that a collective bargaining agreement does not give rise to a contract of employment. SDCL 3-18-8.2 provides: “Any school district issuing contracts to teachers for the ensuring year, but prior to reaching agreement with the representatives of the recognized employee unit, shall issue the contracts under the same terms and conditions as for the current year.” (Emphasis added.) Moreover, the District’s then current agreement with the Association provided: “Individual teacher’s contracts shall be in the form as provided in Appendix A and will reflect the terms and conditions of this agreement.” The contract provided that it became binding when signed by the teacher and officials of the District and could be modified only by mutual agreement of the parties.
[¶ 49.] The second sentence of SDCL 3-18-8.2 is relevant to the resolution of this case. That statute provides: “If no agreement is reached in negotiations and the intervention of the labor department under 3-18-8.1 fails to bring about the agreement, the board shall implement, as a minimum, the provisions of its last offer, including tentative agreements.” (Emphasis added.) The majority interprets the “as a minimum” language to mean that the District is required to implement its last offer to all members of the bargaining unit. See Majority Opinion ¶¶ 16-20. The majority thus concludes that the District inequitably applied its last offer when it did not apply Article X to all new teachers. See Majority Opinion ¶ 24.
[¶ 50.] The majority essentially characterizes this case as a conflict between a collective bargaining agreement and a peripheral individual contract. See Majority Opinion ¶¶ 25-28. However, the fifteen teachers hired while negotiations were in progress signed individual contracts with the District as required by SDCL 3-18-8.2 and the terms of the then current agreement with the Association and on the form provided by the agreement. The contracts stated a specific salary for the school year and did not reference a salary schedule. The terms of the last offer were later imposed when the Association and District were unable to reach an agreement.
[¶ 51.] I agree that the District was required to implement the provisions of its last offer “as a minimum.” See Majority Opinion ¶¶ 16-20. However, contrary to the majority, I believe the “as a minimum” language applies not only to the District’s last offer, but also to the individual contracts at issue in this case because those binding contracts were entered into pursuant to the terms of the then current agreement. See Majority Opinion ¶¶ 16-20. In implementing the new salary schedule incorporated into the District’s last offer, the District discovered that seven of the fifteen new teachers would receive lower salaries under Article X than the salaries stated in their individual contracts. The District did not act unilaterally. The District paid those seven new teachers according to their binding individual contracts. SDCL 3-18-8.2 obligated the District to comport with the minimum terms of its last offer, and the District did so when it *495 honored the higher salaries stated in the individual contracts with the seven new teachers. For these reasons, I believe the District neither inequitably applied its last offer nor committed a grievable action under SDCL 3-18-1.1.
[¶ 52.] The District entered into the same standard binding contract with all teachers. The terms of that contract provided that it could be modified only by mutual agreement of the District and the individual teacher. The record does not show that the seven new teachers who were to receive lower salaries under Article X agreed to such a modification. In the absence of an agreement between the District and the teacher to modify the terms of the contract, the District was without authority to modify the yearly salary stated in each teacher’s individual contract. Presumably, other teachers who entered into binding contracts with the District, but were to receive higher salaries under Article X, agreed to the addendum to their contract, thus modifying their contract to receive an increased salary. If these other teachers had not accepted the addendum to their individual contracts, they would not have been entitled to the higher rate of pay provided in Article X.
[¶ 53.] The majority concludes that the District inequitably applied its last offer when it did not apply Article X to all new teachers. See Majority Opinion ¶ 24. This conclusion begs the question: To whom was the District’s decision not to apply Article X to the seven new teachers inequitable? First, it cannot be seriously argued that the District inequitably applied its last offer to the seven new teachers entitled to a higher salary under their individual contracts than under Article X. Indeed, the seven new teachers could have brought a breach of contract claim against the District had it applied Article X to them unless they agreed to a salary reduction from the amount in their binding individual contracts. See J.I. Case, 321 U.S. at 339, 64 S.Ct. at 581. Second, the District’s decision to honor the individual contracts was not inequitable to other teachers in the District. It is undisputed that the salaries of the seven new teachers did not affect the ADM Advancement Pool. A new provision specifying a “new hire increment” was added to Article X. This new provision did not apply to returning teachers, and the salaries of the seven new teachers did not diminish the ADM Advancement Pool.
[¶ 54.] The cases cited by the majority in support of its conclusion are distinguishable from the case at hand. See Majority Opinion ¶¶ 25-28. Each case the majority cites involves a conflict between a collective bargaining agreement and a peripheral individual contract. See Niesent, 505 N.W.2d 781 (considering whether progressive discipline policy that modified terms of collective bargaining agreement was implied contract of employment); J.I. Case, 321 U.S. 332, 64 S.Ct. 576 (involving individual contracts executed before union was certified as exclusive bargaining representative of employees and addressing unfair labor practices, not enforceability of individual contracts); Order of R.R. Telegraphers, 321 U.S. 342, 64 S.Ct. 582 (answering question whether carrier by contracts with individual employees made in 1930 could supersede or expand terms of collective bargaining agreement from 1917); Collins, 147 N.H. 701, 797 A.2d 132 (involving individual three-year training agreements that provided that officers would be paid according to salary schedule incorporated into collective bargaining agreement). Because the individual contracts between the seven new teachers and the District are within the terms of SDCL 3-18-8.2 and the District’s then current agreement with the Association, these *496 cases do not control the resolution of the dispute in this ease.
[¶ 55.] Additionally, J.I. Case and its progeny do not stand for a proposition as broad as the majority contends. See Majority Opinion ¶¶ 25-28. In J.I. Case, the United States Supreme Court held “that employers could not use individual employment contracts to defeat or delay collective bargaining, to exclude a contracting employee from a bargaining unit, or to limit or condition the terms of the [collective bargaining agreement].” Collins, 147 N.H. at 703, 797 A.2d at 134 (citing J.I. Case, 321 U.S. at 337, 64 S.Ct. at 580). The Court “left open the possibility that individual contracts might provide more advantageous terms than a [collective bargaining agreement].” Id. (citing J.I. Case, 321 U.S. at 338-39, 64 S.Ct. at 580-81). “The [C]ourt noted that while individual contracts could not subtract from the [collective bargaining agreement], they could possibly enhance benefits offered by the [collective bargaining agreement].” Id. at 703-04, 797 A.2d at 134 (citing J.I. Case, 321 U.S. at 338-39, 64 S.Ct. at 580-81). Ultimately, the Court left whether individual contracts may add to collective bargaining agreements in some circumstances “to be determined by appropriate forums under the laws of contracts applicable.” J.I. Case, 321 U.S. at 339, 64 S.Ct. at 581. “Individual employment contracts are not inevitably superseded by any subsequent collective bargaining agreement covering those employees.” 20 Richard A. Lord, Williston on Contracts § 55:25 (4th ed) (citing Caterpillar v. Williams, 482 U.S. 386, 107 S.Ct. 2425, 96 L.Ed.2d 318 (1987)).
[¶ 56.] The Court cautioned, however, that “[t]he practice and philosophy of collective bargaining looks with suspicion on ... individual advantages.” J.I. Case, 321 U.S. at 338, 64 S.Ct. at 580. “increased compensation, if individually deserved, is often earned at the cost of breaking down some other standard thought to be for the welfare of the group, and always creates the suspicion of being paid at the long-range expense of the group as a whole.” Id. at 338-39, 64 S.Ct. at 581. This concern, although legitimate, does not arise under the unique facts of this case. The District did not bargain individually with the seven affected teachers. No standard will suffer, because the salaries of the seven new teachers do not affect the ADM Advancement Pool. Furthermore, the individual contracts were not in derogation of a collective bargaining agreement, but were required by state law and the terms of the District’s then current agreement with the Association. Under the facts of this case, the standard remains intact.
[¶ 57.] Because I do not believe the District violated or inequitably applied the terms of an agreement, I would not address the proper remedy to be fashioned in this case. The Association now argues that the seven new teachers’ salaries should be reduced retroactively, and over-payments to the teachers should be repaid to the District. The District argues that the parties should be left where they are. It must be noted that the individual teachers adversely affected are not parties to this proceeding and had binding contracts with the District. The circuit court has no jurisdiction to retroactively reduce the salaries of individuals not a party to this proceeding and order repayment as advocated by the Association. Indeed, the seven new teachers could bring a suit for breach of contract against the District if they are paid anything other than the salary provided in their individual contracts with the District, a result acknowledged in J.I. Case, 321 U.S. at 339, 64 S.Ct. at 581. While the majority claims that the salaries of the seven new teachers will forever be out of sync with the salary schedule that applies to all other members of the bar *497 gaining unit, adjustments could be the subject of future negotiations.
[¶ 58.] For these reasons, I respectfully dissent.